**MARKOWITZ HERBOLD PC**
Stanton R. Gallegos, OSB #160091
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085
Email: stantongallegos@markowitzherbold.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot*
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL  33131
Telephone: (305)-330-5512
Facsimile: (305) 676-9006
E-Mail: swestcot@bursor.com
          creilly@bursor.com

*Attorneys for Plaintiffs and the Putative Class*
*\*Pro Hac Vice Application Forthcoming*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| LIZETH JIMENEZ, AYREANNE BORDEAUX, KRYSTINE AQUINO-RORALDO, and REGINA BERRIOS, individually and on behalf of all others similarly situated,<br><br>             Plaintiffs,<br><br>    v.<br><br>MARS, INC.,<br><br>           Defendant. | Case No. _____<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**(1) VIOLATION OF CALIFORNIA'S INVASION OF PRIVACY ACT ("CIPA"), CAL. PENAL CODE § 631**<br><br>**(2) VIOLATION OF CALIFORNIA'S INVASION OF PRIVACY ACT ("CIPA"), CAL. PENAL CODE § 632**<br><br>**JURY TRIAL DEMANDED** |

**Page 1 – COMPLAINT**

Plaintiffs Lizeth Jimenez, AyreAnne Bordeaux, Krystine Aquino-Roraldo, and Regina Berrios ("Plaintiffs"), on behalf of themselves and all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this suit on behalf of all Facebook users who have an account with Banfield Pet Hospital ("Banfield") or VCA Animal Hospitals ("VCA").

2. Mars, Inc. ("Defendant" or "Mars") owns and operates Banfield and VCA, two of the "largest veterinary practices in the world."[1]

3. Defendant aids, employs, agrees with, and conspires with a third party, Meta Platforms, Inc. ("Facebook"), to eavesdrop on communications sent and received by Plaintiffs and Class members, including communications that contain sensitive and confidential information. By failing to receive consent before helping Facebook intercept these communications, Defendant violated the California Invasion of Privacy Act.

## PARTIES

4. Plaintiff Lizeth Jimenez is domiciled in Huntington Park, California. In or around 2010, Plaintiff Jimenez created a Facebook account. Between 2019 and November 2022, Plaintiff Jimenez visited a website operated by Defendant, www.vcahospitals.com. Upon accessing www.vcahospitals.com, Plaintiff Jimenez scheduled veterinary appointments, purchased veterinary medications, and checked her pet's medical records. Although unaware at the time, Plaintiff Jimenez is informed and believes that Defendant assisted Facebook with intercepting her communications, including communications that contained confidential information about her pet's veterinarian records.

---

[1] BANFIELD PET HOSPITALS, LINKEDIN, HTTPS://WWW.LINKEDIN.COM/COMPANY/BANFIELD-PET-HOSPITAL/; *see also* MARS, OUR VETERINARY BUSINESSES, HTTPS://WWW.MARSVETERINARY.COM/WHO-WE-ARE/OUR-COMPANIES/.

5.      Plaintiff AyreAnne Bordeaux is domiciled in Sugarloaf, California.  In or around 2009, Plaintiff Bordeaux created a Facebook account.  Between 2020 and November 2023, Plaintiff Bordeaux visited a website operated by Defendant, www.vcahospitals.com.  Upon accessing www.vcahospitals.com, Plaintiff Bordeaux scheduled veterinary appointments and checked her pet's medical records.  Although unaware at the time, Plaintiff Bordeaux is informed and believes that Defendant assisted Facebook with intercepting her communications, including communications that contained confidential information about her pet's veterinarian records.

6.      Plaintiff Krystine Aquino-Roraldo is domiciled in Daly City, California.  In or around 2010, Plaintiff Aquino-Roraldo created a Facebook account.  Between August 2023 and November 2022, Plaintiff Aquino-Roraldo visited a website operated by Defendant, www.banfield.com.  Upon accessing www.banfield.com, Plaintiff Aquino-Roraldo scheduled veterinary appointments, purchased veterinary medications, and checked her pet's medical records.  Although unaware at the time, Plaintiff Aquino-Roraldo is informed and believes that Defendant assisted Facebook with intercepting her communications, including communications that contained confidential information about her pet's veterinarian records.

7.      Plaintiff Regina Berrios is domiciled in Roseville, California.  In or around July 2007, Plaintiff Berrios created a Facebook account.  Between July 2023 and November 2023, Plaintiff Berrios visited a website operated by Defendant, www.banfield.com.  Upon accessing www.banfield.com, Plaintiff Berrios scheduled veterinary appointments and checked her pet's medical records.  Although unaware at the time, Plaintiff Berrios is informed and believes that Defendant assisted Facebook with intercepting her communications, including communications that contained confidential information about her pet's veterinarian records.

8.      Mars, Inc. is headquartered in McLean, Virginia.  Mars, Inc. does business throughout Oregon and the United States.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as amended by the Class Action Fairness Act of 2005 ("CAFA"), because this case is a class

action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are over 100 members of the putative class, and Plaintiffs, as well as most members of the proposed class, are citizens of different states than Defendant.

10. This Court has personal jurisdiction over Defendant because Defendant purposefully availed itself of this forum by conducting substantial business within Oregon such that Defendant has significant, continuous, and pervasive contacts with the State of Oregon.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiffs' claims took place within this District.

## STATEMENT OF FACTS

### I. FACEBOOK'S PLATFORM AND ITS BUSINESS TOOLS

12. Facebook describes itself as a "real identity platform,"[2] meaning users are allowed only one account and must share "the name they go by in everyday life."[3]  To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[4]

13. In 2021, Facebook generated $117 billion in revenue.[5]  Roughly 97% of that came from selling advertising space.[6]

14. Facebook sells advertising space by highlighting its ability to target users.[7]

---

[2] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).
[3] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.
[4] FACEBOOK, SIGN UP, https://www.facebook.com/.
[5] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx .
[6] *Id.*
[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

**Page 4 – COMPLAINT**

Facebook can target users so effectively because it surveils user activity both on and off its site.[8] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

15.    Advertisers can also build "Custom Audiences."[11]  Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12]  With Custom Audiences, advertisers can target existing customers directly, and they can also build "Lookalike Audiences," which "leverages information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]  Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[14]

16.    As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who

---

[8] FACEBOOK, ABOUT FACEBOOK PIXEL,
https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.
[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK,
https://www.facebook.com/business/news/Core-Audiences.
[11] FACEBOOK, ABOUT CUSTOM AUDIENCES,
https://www.facebook.com/business/help/744354708981227?id=2469097953376494.
[12] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS,
https://www.facebook.com/business/ads/ad-targeting.
[13] Facebook, About Lookalike Audiences,
https://www.facebook.com/business/help/164749007013531?id=401668390442328.
[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE,
https://www.facebook.com/business/help/170456843145568?id=2469097953376494; Facebook,
Create a Website Custom Audience,
https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

might be interested in their products and services."[15]  Put more succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

17.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[16]  Facebook's Business Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  Advertisers can even create their own tracking parameters by building a "custom event."[18]

18.     One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to advertisers, like Mars, to integrate into their websites.  As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[19]  When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software script surreptitiously directs the user's browser to send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  Two sets of code are thus

---

[15] FACEBOOK, THE FACEBOOK BUSINESS TOOLS,
https://www.facebook.com/help/331509497253087.
[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED,
https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP,
https://www.facebook.com/business/help/218844828315224?id=1205376682832142;
FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.
[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS,
https://www.facebook.com/business/help/402791146561655?id=1205376682832142.
[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS,
https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.
[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

**Page 6 – COMPLAINT**

automatically run as part of the browser's attempt to load and a website—the website's own code, and Facebook's embedded code.

19.     An example illustrates the point.  Take an individual who navigates to banfield.com and clicks on a tab to browse medication.  Once that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because Defendant utilizes the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Facebook causes the browser to secretly duplicate the communication with Defendant, transmitting it to Facebook's servers, alongside additional information that transcribes the communication's content and the individual's identity.

20.     After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

21.     Facebook's other Business Tools function the same.  For mobile applications, advertisers can utilize the Facebook SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting." [20]

22.     Advertisers can also utilize the "Conversions API."  The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[21]  More technically, the Conversions API is Facebook code that advertisers can implement server-side.[22]  Because it operates server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Facebook." [23]  When the Conversions API collects "[s]erver events," those data points are

---

[20] FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.
[21] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api.  This refers to device specific privacy controls.
[22] *Id.*
[23] *Id*.

"linked to a Meta Pixel ID and are processed like web events sent via Pixel."[24]  As with the Facebook Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously. [25]  Facebook "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel and follow other best practices."[26]

## II.    DEFENDANT AND FACEBOOK'S BUSINESS TOOLS

23.    Defendant owns and operates banfield.com and vcahospitals.com.  Defendant has integrated the Facebook Tracking Pixel into both websites.

Figure 1



Figure 2



---

[24] *Id.*
[25] FACEBOOK, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one.  If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").
[26] *Id.*

24.     Through these websites, pet owners can schedule appointments, purchase medications, and check their pet's medical records.  When pet owners use these functionalities, they must provide Defendant with confidential information about themselves and their pets.  Unbeknownst to pet owners, however, Defendant uses Facebook's Business Tools to help Facebook eavesdrop on those confidential communications.

**A.     Scheduling Appointments**

25.     To schedule an appointment, pet owners must provide their pet's name and the reason for the visit.  Once they input this information, they can pick a veterinarian and choose a location and time.

Figures 3-6 (Banfield Scheduling Appointments)









Figures 7-10 (VCA Scheduling Appointments)




26.    Defendant uses the Facebook Tracking Pixel to eavesdrop on these communications.

27.     Facebook receives, at a minimum, information disclosing the pet's name, the appointment's location, the appointment's time, the reason for the visit, and the owner's first name, last name, email address, and phone number.

**B.      Purchasing Medications**

28.     To purchase medications, pet owners must have an account and a prescription.

<u>Figure 11</u>



//

//

//

//

//

//

//

//

//

**Page 11 – COMPLAINT**

Figure 12



29.    To log in, users must enter their email addresses.

30.    Defendant uses the Facebook Tracking Pixel to eavesdrop on these communications.

31.    Facebook receives, at a minimum, information disclosing the purchaser's email address and the name of the prescription.

Figures 13-14




**C.    Checking Medical Records**

32.    To check a pet's medical records, owners must log into their accounts.

33.    Pet owners can then review the "pet profile," which displays the pet's name and medical history.

Figure 15



Figure 16



34.    Defendant uses the Facebook Tracking Pixel to eavesdrop on these communications.

//

//

//

**Page 13 – COMPLAINT**

35.    Facebook receives, at a minimum, information revealing the user's email address and what kind of medical history is being viewed.

<u>Figures 17-18</u>




## III.    DEFENDANT ASSISTS FACEBOOK WITH PAIRING EVENT DATA TO A USER'S IDENTITY

36.    As industry leaders,[27] trade groups,[28] and courts agree,[29] an email address is personally identifiable information.  Defendant discloses email addresses to Facebook whenever a pet owner schedules an appointment, purchases medications, or checks their pet's medical records.

37.    Along with disclosing email addresses, Defendant's Pixels pair event data with a user's Facebook ID.

38.    When a user accesses Defendant's websites while logged into Facebook, the Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's

---

[27] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[28] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[29] *See*, *e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

unencrypted Facebook ID.  When accessing www.banfield.com, for example, Facebook received

the following six cookies:[30]

Figure 19

| wd | 1252x764 | .facebook.com |
|---|---|---|
| c_user | 100035966074568 | .facebook.com |
| sb | qqAzYsNOnTC8nEyb... | .facebook.com |
| fr | 1cRsusw4TPjFT2dO4... | .facebook.com |
| datr | MalzYjcua-RaV_XkU... | .facebook.com |
| xs | 24%3Aysmw8MIQm... | .facebook.com |

39.     When a visitor's browser has recently logged out of an account, Facebook

compels the visitor's browser to send a smaller set of cookies:[31]

Figure 20

| wd | 1252x764 | .facebook.com |
|---|---|---|
| sb | qqAzYsNOnTC8nEyb... | .facebook.com |
| datr | MalzYjcua-RaV_XkU... | .facebook.com |
| fr | 1cRsusw4TPjFT2dO4... | .facebook.com |

40.     No matter the circumstances, Facebook receives at least one cookie from a

visitor's browser:

Figure 21

| _fbp | fb.1.1697742797171.... | .banfield.com |
|---|---|---|

41.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.

[32] The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser. [33]

The datr cookies also identifies a browser.  Facebook, at a minimum, uses the fr and _fbp

cookies to identify users. [34]

---

[30] Not pictured here is the _fbp cookie, which is sent as a first-party cookie.

[31] Not pictured here is the _fbp cookie, which is sent as a first-party cookie.

[32] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[33] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[34] *Id.*

**Page 15 – COMPLAINT**

42.      The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[35]  If that happens, the time resets, and another 90 days begins to accrue.[36]

43.      The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[37]  If that happens, the time resets, and another 90 days begins to accrue.[38]

44.      The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Mars.[39]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[40]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

45.      Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

46.      Defendant uses these cookies to pair event data with personally identifiable information so it can later retarget consumers on Facebook.

## IV.    DEFENDANT NEVER RECEIVED USERS' CONSENT TO DISCLOSE THEIR CONFIDENTIAL COMMUNICATIONS TO FACEBOOK

### A.      Veterinarian Records are Sensitive and Confidential

47.      California law prohibits veterinarians from "disclos[ing] any information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal."  Cal. Bus. & Prof. Code § 4857(a).

---

[35] *Id*.
[36] Confirmable through developer tools.
[37] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.
[38] Also confirmable through developer tools.
[39] PC MAG, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.
[40] *Id*.  This is also confirmable by tracking network activity.

48.     At least eleven other states statutorily protect veterinary records from unauthorized disclosure. [41]

49.     As the American Veterinary Medical Association recognizes, "[t]he information within veterinary medical records is confidential."[42]

**B.    Defendant Never Receives Consent from Pet Owners to Disclose their Sensitive and Confidential Communications**

50.     Defendant's Terms of Service informs pet owners that, "[i]f you choose to order pet medications or other prescriptions products via the Sites you are waiving confidentiality of those records, to the extent applicable, *with respect of third parties necessary to fill those prescriptions.*"[43]  Facebook has no role in filling out prescriptions.

51.     Defendant also expressly represents that it will refrain from collecting personally identifiable information.  Defendant labels the Facebook Tracking Pixel as a "targeting" cookie.  Those cookies, Defendant represents, "do not store directly personal information, but are based on uniquely identifying your browser and internet device."

//

//

//

//

//

//

---

[41] *See, e.g.*, Ala. Admin Code r. 930-X-1.10(15); 24 Del.C. §3316(a)(7); Fla. Stat. § 474.2165; O.C.G.A. § 50-18-72(a)(2); 225 ILCS 115/25.17(a); IC 25-38.1-4-5.5; K.S.A. 47-839; KRS 321.185; Okla. Stat. tit. 59 § 698.16a(D); 22 Tex. Admin. Code § 573.28(a); U.C.A. 1953 § 58-28-605; Cal. Bus. & Prof. Code § 4857.

[42] AMERICAN VETERINARY MEDICAL ASSOCIATION, PRINCIPLES OF VETERINARY MEDICAL ETHICS OF THE AVMA (Oct. 20, 2023), https://www.avma.org/resources-tools/avma-policies/principles-veterinary-medical-ethics-avma.

[43] MARS, INC., BANFIELD TERMS AND CONDITIONS, https://www.banfield.com/General/Terms; Mars, Inc., VCA Animal Hospitals Terms and Conditions, https://vcahospitals.com/terms-and-conditions.

Figures 22-23



52.     As courts across the country have recognized, however, the identifiers that
Defendant's Pixels capture—Facebook ID, email address, first name, last name, and phone
number—constitute "directly personal information."  By capturing this information anyway,
Defendant fails to receive consent from visitors to intercept their communications.

**C.      Facebook's Terms of Service, Cookies Policy, and Other Policies**

53.      Likewise, Facebook never receives consent from Defendant's website users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.  In fact, Facebook expressly warrants the opposite.

54.      When first signing up for Facebook, a user assents to three agreements: the Facebook Terms of Service,[44] the Cookies Policy,[45] and the Data Policy.[46]  For California residents, Facebook also publishes a California Privacy Policy.[47]

55.      Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[48]  The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[49]

56.      Facebook's Data Policy recognizes that there may be "[d]ata with special protections," meaning information that "could be subject to special protections under the laws of your country."[50]  The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[51]  Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[52]

57.      Facebook then offers an express representation: "**We require each of these partners to have lawful rights to collect, use and share your data before providing any data**

---

[44] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.
[45] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.
[46] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[47] FACEBOOK, CALIFORNIA PRIVACY NOTICE, https://www.facebook.com/legal/policy/ccpa.
[48] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.
[49] *Id*.
[50] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.
[51] *Id*.
[52] *Id.*

**to us.**"[53]  Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[54]

58.    Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[55]

59.    For California residents, Facebook reiterates that policy: "We require each of these partners to have rights to collect, use, and share your data before providing any data to us."[56]  The California Privacy Policy also restrict Facebook's ability to collect "data with special protections," stating they do so only when users "choose to provide it."[57]

60.    Facebook's other representations reinforce these warranties.  In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[58]  And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[59]  Facebook does not "want websites or apps sending us sensitive information about people."[60]  Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[61]

61.    These representations are repeated frequently.  Facebook created a "Help Center" to better explain its practices to users.  In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take

---

[53] *Id.*
[54] *Id.*
[55] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.
[56] FACEBOOK, CALIFORNIA PRIVACY NOTICE, https://www.facebook.com/legal/policy/ccpa.
[57] *Id.*
[58] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.
[59] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565.
[60] *Id.*
[61] *Id.*

**Page 20 – COMPLAINT**

action against that business or organization."[62]  In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[63]

62.    A reasonable user who reads Facebook's terms and representations would understand those terms as requiring Facebook to enforce an advertiser's compliance with its terms.  At a minimum, those terms and representations require Facebook to build safeguards for sensitive information, like information disclosing a pet's health records.  No reasonable user would read those terms and representations as permitting Facebook to intentionally intercept electronic communications that it knows the law protects and deems sensitive.  And no user, reasonable or not, could read those terms as allowing Facebook to aid and abet another party's disclosure of such protected and sensitive information.  In short, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

## CLASS ACTION ALLEGATIONS

63.    Plaintiffs seek certification of the following class (the "Class"): All persons in the United States who have a Facebook account and accessed and navigated Defendant's websites.

64.    Plaintiffs reserve the right to modify the class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

65.    Numerosity of the Class: The Class is composed of at least thousands of individuals, the joinder of which in one action would be impracticable.  The disposition of their claims through this class action will benefit both the parties and the Court.

---

[62] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.
[63] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

66.     <u>Existence and Predominance of Common Questions of Fact and Law</u>: There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class.  The questions of law and fact common to the proposed Class predominate over questions affecting only individual class members.  Such questions include, but are not limited to, the following: whether Defendant's disclosure of personally identifiable information violated the laws and statutes at issue herein, whether Plaintiffs and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit, and whether Defendant should be enjoined from similar conduct in the future.

67.     <u>Typicality</u>: Plaintiffs are asserting claims that are typical of the proposed Class members' claims, having accessed and browsed Defendant's websites, www.banfield.com and www.vcahospitals.com.  Plaintiffs and the proposed Class members have similarly suffered harm arising from Defendant's violations of the law, as alleged herein.

68.     <u>Adequacy</u>: Plaintiffs are adequate representatives of the proposed Class.  Their interests do not conflict with, and are not antagonistic to, the interests of the members of that Class.  They will fairly and adequately represent and protect the interests of the Class.

69.     <u>Superiority</u>: A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' and the proposed Class members' claims.  Plaintiffs and the proposed Class members have suffered irreparable harm as a result of Defendant's unfair, unlawful, and unconscionable conduct.  Because of the size of the individual Class members' claims, few, if any, proposed Class members could afford to seek legal redress for the wrongs complained of herein.  Absent the class action, the proposed Class members will continue to suffer losses and the violations of law described herein will continue without remedy, and Defendant will be permitted to retain the proceeds of their misdeeds.  Defendant continues to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

70.     California's substantive law applies to every member of the Class, regardless of where in the United States the Class member resides.  Defendant's own Terms of Service explicitly state: "To the maximum extent permitted by law, these Terms of Use shall be governed

by and construed in accordance with the laws of the State of California without regard to its conflict of law rules, provided that for residents of Quebec, the laws of the Province of Quebec will apply."[64]  By choosing California law for the resolution of disputes covered by its Terms of Service, Defendant concedes that it is appropriate for this Court to apply California law to the instant dispute to all Class members.  Further, California's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class members under the Due Process Clause, *see* U.S. Const. amend. XIV, § 1, and the Full Faith and Credit Clause, *see* U.S. Const. art. IV, § 1, of the U.S. Constitution.  California has significant contact, or significant aggregation of contacts, the claims asserted by the Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.  Defendant's decision to avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims herein constitutionally permissible.  The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiffs and the proposed Class and California has the greatest interest in applying its laws here.

71.    Plaintiffs reserve the right to revise the foregoing class allegations and definitions based on facts learned and legal developments following additional investigation, discovery, or otherwise.

### COUNT I
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 631

72.    Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

73.    Plaintiffs bring this Count individually and on behalf of the members of the putative Class against Defendant.

---

[64] https://vcahospitals.com/terms-and-conditions.

**Page 23 – COMPLAINT**

74.     The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  The Act begins with its statement of purpose.

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code § 630.

75.     California Penal Code § 631(a) provides, in pertinent part:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

76.     A defendant must show it had the consent of <u>all</u> parties to a communication.

77.     At all relevant times, Defendant aided, agreed with, and conspired with Facebook to track and intercept Plaintiffs' and Class members' internet communications while accessing its websites.  Defendant assisted these interceptions without first receiving authorization or consent from Plaintiffs and Class members.

78.     Defendant, when aiding and assisting Facebook's eavesdropping, intended to help Facebook learn some meaning of the content in the URLs and the content the visitor requested.

79.     The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Facebook Tracking Pixel falls under the broad catch-all category of "any other manner":

    a.     The computer codes and programs Facebook used to track Plaintiffs' and the Class members' communications while they were navigating Defendant's websites;

b.     The Plaintiffs' and Class members' browsers;

c.     The Plaintiffs' and Class members' computing and mobile devices;

d.     Facebook's web and ad servers;

e.     The web and ad-servers from which Facebook tracked and intercepted the Plaintiffs' and Class members' communications while they were using a web browser to access or navigate Defendant's websites;

f.     The computer codes and programs used by Facebook to effectuate its tracking and interception of the Plaintiffs' and Class members' communications while they were using a browser to visit Defendant's websites; and

g.     The plan Facebook carried out to effectuate its tracking and interception of the Plaintiffs' and Class members' communications while they were using a web browser or mobile application to visit Defendant's websites.

80.     Pursuant to California Penal Code § 637.2, Plaintiffs and Class members have been injured by the violation of California Penal Code § 631 and each seek damages for the greater of $5,000 or three times the actual amount of damages, as well as injunctive relief.

## COUNT II
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 632

81.     Plaintiffs repeat the allegations contained in the paragraphs above as if fully set forth herein.

82.     Plaintiffs bring this Count individually and on behalf of the members of the putative Class.

83.     The California invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.

84.    California Penal code § 632(a) provides, in pertinent part:

> A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation.

85.    Defendant is liable for aiding and abetting violations of Section 632 by Meta and other third-party vendors.

86.    The following items constitute "an electronic amplifying or recording device" under the CIPA:

a.    The computer codes and programs Facebook used to track Plaintiffs' and the Class members' communications while they were navigating Defendant's websites;

b.    The Plaintiffs' and Class members' browsers;

c.    The Plaintiffs' and Class members' computing and mobile devices;

d.    Facebook's web and ad servers;

e.    The web and ad-servers from which Facebook tracked and intercepted the Plaintiffs' and Class members' communications while they were using a web browser to access or navigate Defendant's websites;

f.    The computer codes and programs used by Facebook to effectuate its tracking and interception of the Plaintiffs' and Class members' communications while they were using a browser to visit Defendant's websites; and

g.    The plan Facebook carried out to effectuate its tracking and interception of the Plaintiffs' and Class members' communications while they were using a web browser or mobile application to visit Defendant's websites.

87.     The data collected on Defendant's websites constitute "confidential communications," as that term is used in Section 632, because class members had objectively reasonable expectations of privacy with respect to their personally identifiable information.

88.     A defendant must show it had the consent of <u>all</u> parties to a communication.

89.     At all relevant times, Defendant aided, agreed with, and conspired with Facebook to track and intercept Plaintiffs' and Class members' internet communications while accessing its websites.  Defendant assisted these interceptions without first receiving authorization or consent from Plaintiffs and Class members.

90.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and class members have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

a.      For an order certifying the putative Class and naming Plaintiffs as the representatives of the putative Class and Plaintiffs' attorneys as Class Counsel to represent the putative Class members;

b.      For an order declaring that the Defendant's conduct violates the statutes referenced herein;

c.      For an order finding in favor of Plaintiffs and the putative Class on all counts asserted herein;

d.      For statutory damages in amounts to be determined by the Court and/or jury;

e.      For prejudgment interest on all amounts awarded;

f.      For injunctive relief as pleaded or as the Court may deem proper; and

g.      For an order awarding Plaintiffs and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: November 29, 2023.                      Respectfully submitted,

**MARKOWITZ HERBOLD PC**

By:_____*/s/ Stanton R. Gallegos*_____

Stanton R. Gallegos, OSB #160091
1455 SW Broadway, Suite 1900
Portland, OR  97201
Telephone: (503) 295-3085
Email: stantongallegos@markowitzherbold.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot*
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305)-330-5512
Facsimile: (305) 676-9006
E-Mail: swestcot@bursor.com
            creilly@bursor.com

*Attorneys for Plaintiffs and the Putative Class*
*\* Pro Hac Vice Application Forthcoming*

2069889.1

**Page 28 – COMPLAINT**