Stanton R. Gallegos, OSB #160091
StantonGallegos@MarkowitzHerbold.com
Jermaine F. Brown, OSB #073415
JermaineBrown@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: (503) 295-3085

Sarah N. Westcot*
swestcot@bursor.com
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512

Max S. Roberts, *admitted pro hac vice*
mroberts@bursor.com
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
*Attorneys for Plaintiffs and the Putative Class*
**Pro Hac Vice Application Forthcoming*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

KRYSTINE AQUINO-RORALDO and REGINA BERRIOS, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MEDICAL MANAGEMENT INTERNATIONAL, INC. d/b/a BANFIELD PET HOSPITAL,

Defendant.

Case No. 3:23-cv-01786-YY

**SECOND AMENDED COMPLAINT FOR:**

**(1) VIOLATION OF CALIFORNIA'S INVASION OF PRIVACY ACT ("CIPA"), CAL. PENAL CODE § 631**
**(2) VIOLATION OF CALIFORNIA'S INVASION OF PRIVACY ACT ("CIPA"), CAL. PENAL CODE § 632**

**JURY TRIAL DEMANDED**

Plaintiffs Krystine Aquino-Roraldo and Regina Berrios ("Plaintiffs"), on behalf of themselves and all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiffs bring this suit on behalf of all Facebook users who have an account with Banfield Pet Hospital against Defendant Medical Management International, Inc. d/b/a Banfield ("Defendant" or "Banfield").

2. Banfield is one of the "largest veterinary practices in the world."[1]

3. Defendant aids, agrees with, employs, or otherwise enables a third party, Meta Platforms, Inc. ("Facebook"), to eavesdrop on communications sent and received by Plaintiffs and Class Members, including communications that contain sensitive and confidential information about their pets. By failing to procure consent before enabling Facebook to intercept these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## THE PARTIES

4. Plaintiff Krystine Aquino-Roraldo is a resident and citizen of Daly City, California. In or around 2010, Plaintiff Aquino-Roraldo created a Facebook account. Between August 2023 and November 2022, Plaintiff Aquino-Roraldo visited a website operated by Defendant, www.banfield.com (the "Banfield Website"), on the same browser as she accessed Facebook. Plaintiff Aquino-Roraldo was in California when she visited the Banfield Website.

[1] BANFIELD PET HOSPITALS, LINKEDIN, https://www.linkedin.com/company/banfield-pet-hospital/; *see also* MARS, OUR VETERINARY BUSINESSES, https://www.marsveterinary.com/who-we-are/our-companies/.

Upon accessing the Banfield Website, and as alleged in greater detail below, Plaintiff Aquino-Roraldo scheduled veterinary appointments, purchased veterinary medications, and checked her pet's medical records. Each of these communications was intercepted in transit by Facebook—as enabled by Defendant—including communications that contained confidential information about her pet's veterinarian records. Neither Defendant nor Facebook procured Plaintiff Aquino-Roraldo's prior consent to this interception, nor was Plaintiff Aquino-Roraldo on notice of the fact that such interceptions were occurring.

5. Plaintiff Regina Berrios is a resident and citizen of Roseville, California. In or around July 2007, Plaintiff Berrios created a Facebook account. Between July 2023 and November 2023, Plaintiff Berrios visited a website operated by Defendant, the Banfield Website, on the same browser as she accessed Facebook. Plaintiff Berrios was in California when she visited the Banfield Website. Upon accessing the Banfield Website, and as alleged in greater detail below, Plaintiff Berrios scheduled veterinary appointments and checked her pet's medical records. Each of these communications was intercepted in transit by Facebook—as enabled by Defendant—including communications that contained confidential information about her pet's veterinarian records. Neither Defendant nor Facebook procured Plaintiff Berrios's prior consent to this interception, nor was Plaintiff Berrios on notice of the fact that such interceptions were occurring.

6. Defendant Medical Management International, Inc. d/b/a Banfield Pet Hospital is a Delaware corporation with its principal place of business at 18101 SE 6th Way, Vancouver, Washington, 98683. Defendant Banfield is registered to do business in Oregon, conducts extensive business throughout Oregon, and has 29 locations in Oregon.[2]

[2] https://www.banfield.com/locations/hospitals-by-state.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, there are over 100 members of the putative Class, and at least one member of the proposed Class is a citizen of a state different from at least one Defendant.

8. This Court has personal jurisdiction over Defendant by agreement between counsel for the Parties. Further, Defendant Banfield has numerous Oregon locations.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 by agreement between counsel for the Parties.

## STATEMENT OF FACTS

### I. California Protects Its Residents' Privacy In Online Communications Concerning Veterinary Care

#### A. The California Invasion of Privacy Act

10. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

11. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

12. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

13. As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

> (i) "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire";
>
> (ii) "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or
>
> (iii) "us[ing], or attempt[ing] to use … any information so obtained."

14. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

15. The California Legislature also enacted CIPA § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential

communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

16. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

17. Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.3.

**B. California Business & Professional Code § 4857(a)**

18. As the American Veterinary Medical Association ("AMVA") recognizes, "[t]he information within veterinary medical records is confidential."[3]

19. Indeed, one of AMVA's principles is that veterinarians "must protect the personal privacy of clients, and veterinarians must not reveal confidences unless required to by law or unless it becomes necessary to protect the health and welfare of other individuals or animals."[4]

20. In 1999, in line with these principles, the California Legislature enacted Cal. Bus. & Prof. Code § 4857(a), which prohibits veterinarians from "disclos[ing] any information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal."

21. According to the law's sponsors:

> Many veterinarians currently conduct business as if their records were "confidential." *Veterinary clients believe the records to be confidential*, as their own personal records are kept confidential with their medical doctors. [The California Veterinary Medical Association] feels that public policy should be established to

[3] American Veterinary Medical Association, Principles of veterinary medical ethics of the AVMA (Oct. 20, 2023), https://www.avma.org/resources-tools/avma-policies/principles-veterinary-medical-ethics-avma.

[4] *Id.*

> make it clear that the privilege of releasing veterinary information *rests with the client*.

California Bill Analysis, S.B. 490 Sen. (May 11, 1999) (emphasis added).

22. Further, as the legislative history indicates, misuse of veterinary medical information can be problematic. "For instance, information from a medical record in the wrong hands could cause harm to a breeder's reputation, obstruct a contractual sale, or even alter the value and salability of an animal." *Id.* (cleaned up).

## II. Facebook, as Enabled By Defendant, Wiretaps Californians' Communications Concerning their Pets' Veterinary Care, in Violation of the CIPA

### A. Overview of Facebook's Advertising Platform and the Meta Pixel

23. Facebook describes itself as a "real identity platform,"[5] meaning users are allowed only one account and must share "the name they go by in everyday life."[6] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[7]

24. In 2021, Facebook generated $117 billion in revenue.[8] Roughly 97% of that came from selling advertising space.[9]

[5] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[6] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[7] FACEBOOK, SIGN UP, https://www.facebook.com/.

[8] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[9] *Id.*

25. Facebook sells advertising space by highlighting its ability to target users.[10] Facebook can target users so effectively because it surveils user activity both on and off its site.[11] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[12] Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[13]

26. Advertisers can also build "Custom Audiences."[14] Custom Audiences enable advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[15] With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[16]

27. Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through

---

[10] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[11] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[12] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[13] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[14] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[15] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[16] FACEBOOK, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[17]

28. As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[18]

29. Put succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

30. The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[19] However, Facebook's Business Tools can also track other events. Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or

---

[17] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[18] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[19] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

purchases.[20] Advertisers can even create their own tracking parameters by building a "custom event."[21]

31. One such Business Tool is the Facebook Tracking Pixel. Facebook offers this piece of code to advertisers, like Defendant, to integrate into their websites. As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[22] When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software surreptitiously directs the user's browser to simultaneously send a separate message to Facebook's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically run as part of the browser's attempt to load a website: the website's own code and Facebook's embedded code.

32. An example illustrates the point. Take an individual who navigates to the Banfield Website and clicks on a tab to browse medication. Once that tab is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage. Because Defendant utilizes the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening. Facebook causes the browser to secretly and simultaneously duplicate the communication with Defendant, transmitting it to Facebook's

---

[20] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[21] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[22] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

servers alongside additional information that transcribes the communication's content and the individual's identity. This entire process occurs within milliseconds.

33. In other words, when a user communicates with Defendant's website, those communications are simultaneously and contemporaneously duplicated and sent to Facebook at the same time as they are being sent to Defendant. Thus, Facebook's interception of these communications occurs "in transit." *See, e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 960-62 (N.D. Cal. 2023) (finding in-transit interception alleged based on a similar process to the one alleged herein).

34. After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

35. Facebook's other Business Tools function the same. For mobile applications, advertisers can utilize the Facebook SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[23]

---

[23] FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

36. Advertisers can also utilize the "Conversions API." The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[24] More technically, the Conversions API is Facebook code that advertisers can implement server-side.[25] Because it operates server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Facebook."[26]

37. When the Conversions API collects "[s]erver events," those data points are "linked to a Meta Pixel ID and are processed like web events sent via Pixel."[27] As with the Facebook Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously.[28] Facebook "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel and follow other best practices."[29]

38. Facebook confirms, in its "Meta Business Tools Terms,"[30] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant. For instance, Facebook can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products." In other words, Facebook can

---

[24] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api. This refers to device specific privacy controls.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] FACEBOOK, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one. If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").

[29] *Id.*

[30] FACEBOOK, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

use the wiretapped information for its own "research and development," as well as to "protect" its own products and services.

39. Facebook can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products.".”[31]

40. Further, Facebook can use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[32]

41. Finally, Facebook can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[33]

42. Thus, Facebook has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendant, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

**B. Defendant Enables Facebook, Through the Meta Pixel, to Intercept Californians' Communications Concerning their Pets**

43. Defendant owns and operates the Banfield Website. Defendant has integrated the Facebook Tracking Pixel into its website:




**Figure 1 – Showing That The Facebook Pixel Is Operating On The Banfield Website**

44. On this website, pet owners can schedule appointments, purchase medications, and check their pet's medical records. When pet owners use these functionalities, they must provide Defendant with confidential information about themselves and their pets.

45. Unbeknownst to pet owners, however, Defendant aids, agrees with, employs, or otherwise enables Facebook to eavesdrop on those confidential communications using Facebook's Business Tools.

46. These confidential communications are the product of pet owners affirmatively entering and interacting with information on the websites at issue (*i.e.*, the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from pet owners typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of pet owners: information created by and in response to pet owners' communicative inputs; information created by and in response to pet owners'

intended messages to the websites at issue and Defendant; and information created by and in response to pet owners having conveyed and expressed their respective desires that the websites would supply them with certain, highly personalized, types of information and/or responses.

**1. Facebook, as Enabled By Defendant, Intercepts Communications Concerning Scheduling Appointments, Including Pet and Owner Names**

47. As illustrated below, Facebook, through its Business Tools and as enabled by Defendant, intercepts confidential communications when a consumer schedules a veterinary appointment.

48. On the Banfield Website, users first enter the name of their pet into a form field. Users also select whether the pet is a dog or cat and select the pet's gender (and whether the pet has been neutered or spayed) from a drop-down menu:




**Figure 2**

49. Next, users select the reason for their visit from a list of options, including whether this is a "new pet" or if this is a "general health check" for a previously-seen pet:




**Figure 3**

50. Then, users select the date and time for their veterinary appointment, as well as the location. This communication involves a user typing in an address and then clicking on specific dates and times, the same as if a user called the clinic over the phone and asked to schedule an appointment:




**Figure 4**

51. Finally, the patient enters his or her full name, email address, and phone number into form fields. Again, this is the same as if a patient were to call up the clinic to schedule an appointment and provide their contact details over the phone:




**Figure 5**

52. Facebook, as enabled by Defendant, contemporaneously intercepts the contents of each of these communications (*i.e.*, the information entered by users into the above form fields, or the options selected by users) using the Facebook Tracking Pixel.

**2. Facebook, as Enabled By Defendant, Intercepts Communications Concerning the Medications Owners Purchase For their Pets**

53. When users purchase pet medications from the Banfield Website, they visit the URL for that medication on Banfield's shop. From there, users select the strength and size of the medication, the packaging, and whether it is a one-time purchase or a reoccurring purchase:




Figure 7

54. Facebook, as enabled by Defendant, contemporaneously intercepts the URL of the Banfield webpage visited by users—which contains the name of the pet's medication—using the Facebook Tracking Pixel. Further, Facebook intercepts that the Banfield users clicked the button to purchase medication, which users have to affirmatively select:




Figure 8

55. In short, on the Banfield Website, Facebook, as enabled by Defendant, contemporaneously intercepts the names of the medications users purchase for their pets.

### 3. Facebook, as Enabled By Defendant, Intercepts Communications Concerning Pet Profile Views

56. To check a pet's medical records, owners must log into their accounts. Pet owners can then review the "pet profile," which displays the pet's name and medical history.




**Figure 9**

57. On both websites, Facebook, as enabled by Defendant, contemporaneously intercepts users' email address and what kind of medical history is being viewed, using the Facebook Tracking Pixel:


CompleteRegistration

EVENT INFO

**Setup Method**: Manual

**URL called**: Hide

https://www.facebook.com/tr/?id=746751738864113&ev=CompleteRegistration&dl=https%3A%2F%2Fwww.banfield.com%2Fmy-banfield%2Fpet-detail%3FpatientID%3Dda270096-3a42-eb11-aa00-6c2b59c52505%26preventive-care%3Dpreventivecare-checkup&rl=https%3A%2F%2Fwww.banfield.com%2F&if=false&ts=1698016852933&sw=1920&sh=1080&v=2.9.135&r=stable&ec=1&o=30&fbp=fb.1.1697742797171.1995053413&ler=other&it=1698016852801&coo=false&rqm=GET

**Load Time**: 16.39 ms

**Pixel Location**: Hide

https://www.banfield.com/my-banfield/pet-detail?patientID=da270096-3a42-eb11-aa00-6c2b59c52505&preventive-care=preventivecare-checkup

**Figure 60**

**C. Defendant Enables Facebook to Pair Event Data with a User's Identity**

58. As industry leaders,[34] trade groups,[35] and courts agree,[36] an email address is personally identifiable information. Defendant discloses email addresses to Facebook whenever a pet owner schedules an appointment, purchases medications, or checks their pet's medical records.

59. Along with disclosing email addresses, Facebook's Pixels—as enabled by Defendant—pair event data with a user's Facebook ID.

60. When a user accesses Defendant's websites while logged into Facebook, the Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID. When accessing the Banfield Website, for example, Facebook received the following six cookies, including the c_user cookie:[37]

| | | |
|---|---|---|
| wd | 1252x764 | .facebook.com |
| c_user | 100035966074568 | .facebook.com |
| sb | qqAzYsNOnTC8nEyb... | .facebook.com |
| fr | 1cRsusw4TPjFT2dO4... | .facebook.com |
| datr | MalzYjcua-RaV_XkU... | .facebook.com |
| xs | 24%3Aysmw8MIQm... | .facebook.com |

**Figure 71**

[34] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[35] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[36] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[37] Not pictured here is the _fbp cookie, which is sent as a first-party cookie.

61. When a visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies[38]:

| | | |
|---|---|---|
| wd | 1252x764 | .facebook.com |
| sb | qqAzYsNOnTC8nEyb... | .facebook.com |
| datr | MalzYjcua-RaV_XkU... | .facebook.com |
| fr | 1cRsusw4TPjFT2dO4... | .facebook.com |

**Figure 18**

62. No matter the circumstances, Facebook receives at least one cookie from a visitor's browser:

| | | |
|---|---|---|
| _fbp | fb.1.1697742797171.... | .banfield.com |

**Figure 13**

63. The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[39] The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser. [40] The datr cookies also identifies a browser. Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[41]

64. The fr cookie expires after 90 days unless the visitor's browser logs back into Facebook.[42] If that happens, the timer resets and another 90 days begins to accrue.[43]

---

[38] Not pictured here is the _fbp cookie, which is sent as a first-party cookie.

[39] Data Protection Commissioner, Facebook Ireland Ltd, Report of Re-Audit (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[40] Facebook, Cookies & other storage technologies, https://www.facebook.com/policy/cookies/.

[41] *Id.*

[42] *Id.*

[43] Confirmable through developer tools.

65. The _fbp cookie expires after 90 days unless the visitor's browser accesses the same website.[44] If that happens, the time resets, and another 90 days begins to accrue.[45]

66. The Facebook Tracking Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant's Banfield Website.[46] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[47] The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

67. Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

68. Defendant uses these cookies to pair event data with personally identifiable information so it can later retarget consumers on Facebook.

**D. Defendant Never Received Users' Consent to Disclose their Confidential Communications to Facebook**

69. To summarize the above allegations, Facebook, as enabled by Defendant, collects the contents of Californians' communications with the Banfield Website using the Facebook Tracking Pixel. These communications include but are not limited to information about Californians' pets, such as the names of those pets, the details of a veterinary appointment, and what medications are being purchased for those pets. *See* Statement of Facts § II.B.1-3, *supra*.

---

[44] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[45] Also confirmable through developer tools.

[46] PC MAGAZINE, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie. This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[47] *Id*. This is also confirmable by tracking network activity.

This is information that is affirmatively entered by users in the Banfield Website. *Id.* This information is not anonymized because (i) Facebook collects users' email addresses, and (ii) Defendant enables Facebook to link users' communications with their Facebook IDs, which reveals their identities. *See* Statement of Facts § II.C, *supra*.

70. Crucially, neither Defendant nor Facebook procure prior consent from Californians for Facebook to engage in this wiretapping. Users, including Plaintiffs, are never given notice of, nor do they consent to, any terms that would permit the wiretapping.

71. Even if users did consent to times (which they do not), Defendant's Terms of Service do not disclose the wiretapping. Specifically, Defendant's Terms of Service informs pet owners that, "[i]f you choose to order pet medications or other prescriptions products via the Sites you are waiving confidentiality of those records, to the extent applicable, *with respect of third parties necessary to fill those prescriptions.*"[48] Facebook has no role in filling out prescriptions.

[48] BANFIELD PET HOSPITALS, TERMS AND CONDITIONS, https://www.banfield.com/General/Terms.

72. Defendant also expressly represents that it will refrain from collecting personally identifiable information. Defendant labels the Facebook Tracking Pixel as a "targeting" cookie. Those cookies, Defendant represent, "do not store directly personal information, but are based on uniquely identifying your browser and internet device."




**Figure 14**

73. As courts across the country have recognized, however, the identifiers that the Facebook Pixel captures—Facebook ID, email address, first name, last name, and phone number—constitute "directly personal information." By capturing this information anyway, Defendant fails to receive consent from visitors to intercept their communications.

74. Likewise, Facebook never receives consent from Defendant's website users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, Facebook expressly warrants the opposite.

75. When first signing up for Facebook, a user assents to three agreements: the Facebook Terms of Service,[49] the Cookies Policy,[50] and the Data Policy.[51] For California residents, Facebook also publishes a California Privacy Policy.[52]

76. Facebook's Terms of Service begins by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[53] The Terms of Service then prohibits anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent."[54]

77. Facebook's Data Policy recognizes that there may be "[d]ata with special protections," meaning information that "could be subject to special protections under the laws of your country."[55] The Data Policy goes on to describe how Facebook collects information from its "Meta Business Tools," including "our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Meta pixel."[56] Specifically, Facebook acknowledges that "[p]artners receive your data when you visit or use their services or through third parties they work with."[57]

78. Facebook then offers an express representation: "*We require each of these partners to have lawful rights to collect, use and share your data before providing any data to*

---

[49] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[50] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[51] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

[52] FACEBOOK, CALIFORNIA PRIVACY NOTICE, https://www.facebook.com/legal/policy/ccpa.

[53] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update..

[54] *Id.*

[55] FACEBOOK, DATA POLICY, https://www.facebook.com/about/privacy/update.

[56] *Id.*

[57] *Id.*

*us*."[58] Facebook does acknowledge collecting "data with special protections" to personalize ads, but critically, only sensitive information that users "choose to provide."[59]

79. Facebook's Cookies Policy ratifies those representations, stating "the Data Policy will apply to our processing of the data that we collect via cookies."[60]

80. For California residents, Facebook reiterates that policy: "We require each of these partners to have rights to collect, use, and share your data before providing any data to us."[61] The California Privacy Policy also restrict Facebook's ability to collect "data with special protections," stating they do so only when users "choose to provide it."[62]

81. Facebook's other representations reinforce these warranties. In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[63] And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[64] Facebook does not "want websites or apps sending us sensitive information about people."[65] Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[66]

---

[58] *Id.*

[59] *Id.*

[60] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[61] FACEBOOK, CALIFORNIA PRIVACY NOTICE, https://www.facebook.com/legal/policy/ccpa.

[62] *Id.*

[63] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.

[64] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565.

[65] *Id.*

[66] *Id.*

82. These representations are repeated frequently. Facebook created a "Help Center" to better explain its practices to users. In an article titled, "How does Facebook receive information from other businesses and organizations?" Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[67] In another article, titled, "How does Meta work with data providers?" Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[68]

83. A reasonable user who reads Facebook's terms and representations would understand those terms as requiring Facebook to enforce an advertiser's compliance with its terms. At a minimum, those terms and representations require Facebook to build safeguards for sensitive information, like information disclosing a pet's health records. No reasonable user would read those terms and representations as permitting Facebook to intentionally intercept electronic communications that it knows the law protects and deems sensitive. And no user, reasonable or not, could read those terms as allowing Facebook to aid and abet another party's disclosure of such protected and sensitive information. In short, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

---

[67] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[68] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830?ref=dp.

## CLASS ACTION ALLEGATIONS

84. Plaintiffs seek certification of the following class: all California residents who have a Facebook account and accessed and navigated the Banfield Website while in California (the "Class").

85. Plaintiffs reserve the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

86. **Numerosity:** The Class is composed of at least thousands of individuals, the joinder of which in one action would be impracticable. The disposition of their claims through this class action will benefit both the parties and the Court.

87. **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class. The questions of law and fact common to the proposed Class predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiffs and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

88. **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Class because the Plaintiffs, like all other class members, visited the Banfield Website and had their confidential electronic communications intercepted and disclosed to Facebook.

89. **Adequacy:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

90. **<u>Superiority</u>:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the entire Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

## COUNT I

### Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631

91. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

92. Plaintiffs bring this claim against Defendant individually and on behalf of the Class.

93. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability

under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

94. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

95. Facebook's Business Tools, including but not limited to the Facebook Pixel, are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

96. Facebook "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Facebook had the capability to use the wiretapped information for its own purposes. Accordingly, Facebook was a third party to any communication between Plaintiffs Class Members, on the one hand, and Defendant, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

97. At all relevant times, by its Business Tools, Facebook willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

98. At all relevant times, Facebook used or attempted to use the communications intercepted by its Business Tools to promote and improve its advertising platform.

99. At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Facebook to wiretap Plaintiffs and Class Members using the Business Tools and to accomplish the wrongful conduct at issue here.

100. Plaintiffs and Class Members did not provide their prior consent to Facebook's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Class Members' electronic communications. Nor did Plaintiffs and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Facebook's conduct.

101. The wiretapping of Plaintiffs and Class Members occurred in California, where Plaintiffs and Class Members accessed the Banfield Website and where Facebook—as enabled by Defendant—routed Plaintiffs' and Class Members' electronic communications to its servers.

102. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

**COUNT II**

**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**

103. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

104. Plaintiffs bring this claim against Defendant individually and on behalf of the Class.

105. CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

106. Facebook's Business Tools, including but not limited to the Facebook Pixel, are "electronic amplifying or recording device[s]."

107. Cal. Bus. & Prof. Code § 4857(a) prohibits veterinarians from "disclos[ing] any information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal." Accordingly, any communications involving "information concerning an animal receiving veterinary services, the client responsible for the animal receiving veterinary services, or the veterinary care provided to an animal" qualify as "confidential communications" under California law.

108. The following pieces of information provided by Plaintiffs and Class Members to the Banfield Website constitute "confidential communications": (i) pet names; (ii) type of veterinary appointment (*e.g.*, general wellness checkup, emergency); (iii) the time and date of a veterinary appointment; (iv) Plaintiffs' and Class Members' personally identifying information (*e.g.*, full name, email address, phone number); (v) the medications searched for and purchased by Plaintiffs and Class Members); and (vi) pet profile views.

109. At all relevant times, Defendant intentionally used Facebook's Business Tools to allow Facebook to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members, on the one hand, and Defendant, on the other.

110. When communicating with Defendant, Plaintiffs and Class Members had an objectively reasonable expectation of privacy. "Veterinary clients believe the records to be confidential, as their own personal records are kept confidential with their medical doctors," and "the privilege of releasing veterinary information rests with the client." California Bill Analysis, S.B. 490 Sen. (May 11, 1999). Thus, Plaintiffs and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other third-party entities like Facebook, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

111. Plaintiffs and Class Members did not consent to any of Facebook's actions. Nor have Plaintiffs or Class Members consented to Facebook's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs and Class Members.

112. Pursuant to Cal. Penal Code § 637.2, Plaintiffs and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order certifying the putative Class, naming Plaintiffs as the representatives of the putative Class, and naming Plaintiffs' attorneys as Class Counsel to represent the putative Class Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the putative Class on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiffs and the putative Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: January 9, 2025.

MARKOWITZ HERBOLD PC

*s/ Jermaine F. Brown*

Stanton R. Gallegos, OSB #160091
StantonGallegos@MarkowitzHerbold.com
Jermaine F. Brown, OSB #073415
JermaineBrown@MarkowitzHerbold.com

*Attorneys for Plaintiffs*

BURSOR & FISHER, P.A.

Sarah N. Westcot*
swestcot@bursor.com
**BURSOR & FISHER, P.A.**
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512

Max S. Roberts, *admitted pro hac vice*
mroberts@bursor.com
**BURSOR & FISHER, P.A.**
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150

*Attorneys for Plaintiffs and the Putative Class*
** Pro Hac Vice Application Forthcoming*

2250207